1

2

3

4

5

6

7

8            IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ANTHONY FLETCHER,

11           Petitioner,              No. CIV S-09-1091 FCD CHS P

12       vs.

13   JAMES P. WALKER,

14           Respondent.        FINDINGS AND RECOMMENDATIONS

15   _____/

16                        **I.  INTRODUCTION**

17           Petitioner, Anthony Fletcher, is a state prisoner proceeding pro se with a petition for

18   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving an indeterminate

19   sentence of forty-five years to life following his convictions by jury trial in the Sacramento County

20   Superior Court, Case No. 05F00982, for first degree murder with a penalty enhancement for

21   personal use of a firearm.  Petitioner presents various claims challenging the constitutionality of his

22   conviction.

23                          **II.  CLAIMS**

24           Petitioner sets forth four grounds for relief in this petition, as follow:

25       (1)    The prosecutor engaged in misconduct by misstating facts
                during (a) direct examination of witness Henrietta Reno and
26                (b) during rebuttal closing argument when referencing the

1

trial testimony of witnesses Henrietta Reno and Beverly Tukes.

(2)     Trial counsel rendered prejudicially ineffective assistance by (a) failing to investigate and prepare for trial; (b) failing to investigate and call witnesses; (c) failing to object to acts of prosecutorial misconduct; and (d) failing to present favorable evidence.

(3)     Appellate counsel rendered prejudicially ineffective assistance by failing to raise Petitioner's above ineffective assistance of trial counsel and prosecutorial misconduct claims on direct appeal.

(4)     The trial court erred in admitting recordings of unduly prejudicial telephone calls made by Petitioner while in jail, in violation of his due process right to a fair trial.

Based on a thorough review of the record and applicable law, it is recommended that each of Petitioner's claims be denied.

### III. BACKGROUND

## A. FACTS

The basic facts of Petitioner's crime were summarized in the partially published opinion of the California Court of Appeal, Third Appellate District, as follow:

Defendant was shot on September 2, 2004, at the corner of 36th Street and Second Avenue in Oak Park. Defendant initially did not want to help the police, but eventually identified the shooter as Dub. As a result, Dub, also known as Christopher Williams, was later convicted of violating Penal Code section 246.3 (grossly negligent discharge of firearm).

At 11:19 p.m. on September 14, 2004, Sacramento Police Detective Michael Poroli took a shots fired call. John Huston[1] was killed by five gunshot wounds to the chest and one to the back of his neck. Huston's body was discovered behind the auditorium at American Legion High School in Oak Park. Huston, who moved from Oakland approximately 15 years earlier and sold drugs in Oak Park, was an acquaintance of Williams.

Defendant also sold drugs in Oak Park. His girlfriend was Henrietta Reno. The mother of his baby is Deana Randle. Latosha Brooks ("Tosha"), was a friend of defendant and lived with Belyn Johnson

---

[1] John Huston, the victim, was also known as "Mack J."

2

("Billie") in a rental house across from American Legion High School. Beverly Tukes managed the rental house and lived next door to Billie and Tosha.

Billie testified that on September 14, 2004, defendant and Henrietta came to her house to deliver a pit bully puppy. The three smoked marijuana for a couple of hours before defendant and Henrietta left. She denied telling an investigator defendant was over at her place around 8:00 p.m. the night of the murder. Billie also denied telling anyone she saw defendant running from American Legion High School and get on a bicycle the night of the murder.

Carolyn Lark[2] gave defendant and Henrietta a ride home the night of the murder. The couple started fighting and defendant left the van, telling Lark to take Henrietta home.

Beverly Tukes heard multiple gunshots from the direction of American Legion High School on the night of the murder. She went to her front porch and saw two people running. One of the two, a Black male, ran towards her. The man told Tukes he was running because of the shooting. He ran to Tosha and Billie's residence and tried to enter their house. Failing at this, the man left through their backyard.

Tandra Davis, Huston's sister, went to American Legion High School with other members of her family the morning after her brother's murder. She met Billie there, who told Tandra defendant shot Huston and then rode away on a bicycle. Billie told her defendant shot Huston because he provided the gun which Christopher Williams used to shoot defendant.

Winston Richards married Billie between the murder and the trial. He testified Della Fort told him she saw defendant flee on a bicycle from the scene of the shooting. Fort, who lived across the street from American Legion High School, testified. She disputed Richards's testimony, denying seeing defendant flee the area on the night of the shooting.

On December 6, 2004, Henrietta Reno telephoned the homicide detective assigned to the case, Sacramento Police Detective Michael Poroli, and told him defendant killed Huston. As defendant left Lark's van, he said, in reference to the looming murder, that "he was going to do it." He said, "'I'm going to make everybody cry.'" Reno saw defendant and his brother with Huston after he got out of Lark's van. Defendant put a gun to Huston's side and said to Huston, "'How come all of a sudden I got shot and don't nobody know nothing.'" He then made Huston take off his shoes and sit against a wall.

---

[2] Carolyn Lark is also known as "Lola."

Defendant's brother[3] was supposed to shoot Huston but could not. Instead, defendant took the gun from his brother and shot Huston.

Reno then went to the police station and told Detective Poroli that Huston had provided the gun Christopher Williams used to shoot defendant. She also said she did not actually see defendant shoot Huston. Defendant had threatened to do something to her if she told anyone about the murder.

Reno went to the police station on December 16, 2004 and told another detective that she lied about defendant's culpability. Reno told the second detective that the word on the street was that she was a snitch, which made her afraid.

Reno married defendant on February 14, 2005, while he was in custody awaiting trial. While visiting defendant before the trial, she was caught handing him a note stating: "Just read my statement. Tell me what you think, and then write what I should say." At trial, Reno claimed her prior statements incriminating defendant were all lies motivated by jealousy over defendant's relationship with Randle.

Deana Randle was afraid to testify due to threats on her life, but decided to testify after the district attorney's office agreed to talk with Fresno County about her probation violation. She said defendant thought he had been shot over a turf dispute. She said defendant admitted shooting and killing someone at American Legion High School. When Randle referred to a news story about Huston's death, defendant told her he killed the person in the news. Defendant also told her he needed a place to stay because he had killed someone and Reno talked too much. He was only marrying Reno "so she would shut up."

Over his objection,[FN1] the trial court admitted recordings of phone calls made by defendant while in custody awaiting trial.[FN2] Defendant is heard on the tapes admitting he wanted to marry Reno to keep her from talking even though he could not stand her. He told his friend Antoine they had to get in Reno's face, he told his brother that someone would have to "snatch her up." Defendant told Antoine that Reno, who was the key, "must stay within the regime and stay out of" the way. Defendant said he had to let Reno know that no one was "badder than [him]" and he had to "pump the fear of God" or "the fear of Anthony" into her. The recorded statements contained numerous swear words, racial epithets referencing Black people, and derogatory references to women.[FN3]

> FN1. Defendant argued the tapes should be suppressed pursuant to Evidence Code section 352, but he never requested the redaction of prejudicial materials from

---

[3] Petitioner's brother is Akintunde Kambon, also known as "Tunde" or "Ta Ta Ta."

4

the tapes.

FN2.   The record contains no transcript of the recordings, but has a CD of the recordings.  Defendant's citation to the recordings note the day and time the conversation containing the particular reference took place.  What defendant does not do is tell this court at what point in the recorded conversation was the cited statement made.  This is analogous to quoting from a case without providing a point page citation.

We refer counsel for defendant to California Rules of Court, rule 8.204(a)(1)(C), which provides that briefs must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears.  If any part of the record is submitted in an electronic format, citations to that part must identify, with the same specificity required for the printed record, the place in the record where the matter appears."

Defendant's brief repeatedly violates this rule, requiring this court waste scarce judicial resources looking for specific statements in over four hours of recordings.

FN3    This opinion does not make any specific references to the actual terms used by defendant in the recordings.  We choose to avoid incorporating vulgar or otherwise improper terms in our opinion unless the use of such words "is in our judgment essential to place the remarks in perspective."  (*United States v. Cintolo*, (1st Cir. 1987) 818 F.2d 980, 984, fn. 3.)  Having examined the record and the parties' arguments carefully, we have determined that it is not essential to state the specific offensive terms employed by defendant in the tapes in order to place them in their proper perspective.

(Lodged Doc. 1 at 1-6).

**B.  TRIAL AND DIRECT APPEAL**

Following a jury trial, Petitioner was convicted of first degree murder with a penalty enhancement for personal use of a firearm.  He was sentenced to twenty-five years to life imprisonment on the murder charge and a consecutive term of twenty years for the firearm enhancement.  Petitioner appealed his conviction to the California Court of Appeal, Third Appellate

1   District on grounds that the trial court should not have admitted the tape recordings of his jail

2   telephone calls.  The appellate court affirmed Petitioner's conviction with a reasoned opinion on

3   May 2, 2007.  He then petitioned for review of his conviction in the California Supreme Court.  The

4   court denied that petition without comment on June 20, 2007.

5   **C. STATE COURT COLLATERAL ATTACKS**

6              After exhausting his direct appellate remedies, Petitioner sought habeas corpus relief

7   on his prosecutorial misconduct claims in the Sacramento County Superior Court.  On May 19,

8   2008, the court denied the petition with a reasoned opinion.  Petitioner next sought habeas corpus

9   relief on his prosecutorial misconduct claims in the California Court of Appeal, Third Appellate

10  District.  The petition was denied without comment on June 12, 2008.  Petitioner then sought habeas

11  corpus relief on his prosecutorial misconduct and ineffective assistance of trial counsel claims in the

12  California Supreme Court.  That petition was denied without comment on January 21, 2009.

13             Petitioner filed a second habeas corpus petition claiming ineffective assistance of

14  appellate counsel in the Sacramento County Superior Court.  On August 5, 2008, the court denied

15  the petition with a reasoned opinion.   Petitioner filed a second habeas corpus petition in the

16  California Court of Appeal, Third Appellate District.  On August 21, 2008, the court denied that

17  petition without comment.  Petitioner once again sought habeas corpus relief in the California

18  Supreme Court.  The court denied relief without comment on January 21, 2009.

19             Petitioner filed a third habeas corpus petition claiming ineffective assistance of trial

20  counsel in the Sacramento County Superior Court.  On July 6, 2009, issued a reasoned opinion

21  denying the petition.  Petitioner filed a third habeas corpus petition in the California Court of

22  Appeal, Third Appellate District, and that court denied his petition without comment on August 20,

23  2009.  Petitioner's third petition for writ of habeas corpus was denied without comment by the

24  California Supreme Court on March 10, 2010.

25  /////

26  /////

**D.  FEDERAL PETITION**

Petitioner filed this federal petition for writ of habeas corpus on April 21, 2009, and he  amended the petition on June 24, 2009.  Respondent filed an answer on June 26, 2009.  On October 14, 2009, the petition was stayed to allow Petitioner to exhaust one of his claims in state court.  The stay was lifted on April 6, 2010, and Respondent amended its answer on May 27, 2010.  Petitioner filed his traverse on September 13, 2010.

### IV.  APPLICABLE STANDARD OF HABEAS CORPUS REVIEW

This case is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment on April 24, 1996.  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997).  Under AEDPA, an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 n. 7 (2000).  Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Although "AEDPA does not require a federal habeas court to adopt any one methodology," *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003), there are certain principles which guide its application.

First, AEDPA establishes a "highly deferential standard for evaluating state-court rulings." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).  Accordingly, when determining whether the law applied to a particular claim by a state court was contrary to or an unreasonable application of "clearly established federal law," a federal court must review the last reasoned state court

1    decision. *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004); Avila v. Galaza, 297 F.3d 911,

2    918 (9th Cir. 2002). Provided that the state court adjudicated petitioner's claims on the merits, its

3    decision is entitled to deference, no matter how brief. *Lockyer*, 538 U.S. at 76; *Downs v. Hoyt*, 232

4    F.3d 1031, 1035 (9th Cir. 2000). Conversely, when it is clear that a state court has not reached the

5    merits of a petitioner's claim, or has denied the claim on procedural grounds, AEDPA's deferential

6    standard does not apply and a federal court must review the claim *de novo*. *Nulph v. Cook*, 333 F.3d

7    1052, 1056 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

8         Second, "AEDPA's, 'clearly established Federal law' requirement limits the area of

9    law on which a habeas court may rely to those constitutional principles enunciated in U.S. Supreme

10   Court decisions." *Robinson*, 360 F.3d at 155-56 (citing *Williams*, 529 U.S. at 381). In other words,

11   "clearly established Federal law" will be " the governing legal principle or principles set forth by

12   [the U.S. Supreme] Court at the time a state court renders its decision." *Lockyer*, 538 U.S. at 64.

13   It is appropriate, however, to examine lower court decisions when determining what law has been

14   "clearly established" by the Supreme Court and the reasonableness of a particular application of that

15   law. *See Duhaime v. Ducharme*, 200 F.3d 597, 598 (9th Cir. 2000).

16        Third, the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have

17   "independent meanings." *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the "contrary to" clause,

18   a federal court may grant a writ of habeas corpus only if the state court arrives at a conclusion

19   opposite to that reached by the Supreme Court on a question of law, or if the state court decides the

20   case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*,

21   529 U.S. at 405. It is not necessary for the state court to cite or even to be aware of the controlling

22   federal authorities "so long as neither the reasoning nor the result of the state-court decision

23   contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). Moreover, a state court opinion need not

24   contain "a formulary statement" of federal law, but the fair import of its conclusion must be

25   consistent with federal law. *Id.*

26        Under the "unreasonable application" clause, the court may grant relief "if the state

8

court correctly identifies the governing legal principle...but unreasonably applies it to the facts of the particular case." *Bell*, 535 U.S. at 694. As the Supreme Court has emphasized, a court may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 410. Thus, the focus is on "whether the state court's application of clearly established federal law is *objectively* unreasonable." *Bell*, 535 U.S. at 694 (emphasis added).

Finally, the petitioner bears the burden of demonstrating that the state court's decision was either contrary to or an unreasonable application of federal law. *Woodford*, 537 U.S. at 24 ; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

# V.  DISCUSSION

## A.  PROSECUTORIAL MISCONDUCT

### 1.  PROCEDURAL BAR

Petitioner alleges that the prosecutor engaged in several acts of misconduct during his trial, in violation of his federal right to due process of law. Specifically, Petitioner claims that the prosecutor misstated facts during the examination of Henrietta Reno and during rebuttal closing argument regarding the trial testimony of Henrietta Reno and Beverly Tukes. The Sacramento County Superior Court rejected Petitioner's claims as procedurally barred, explaining its reasoning as follows:

> Claims that could have been raised on appeal are not cognizable on habeas corpus unless the petitioner can show that (1) clear and fundamental constitutional error strikes at the heart of the trial process; (2) the court lacked fundamental jurisdiction; (3) the court acted in excess of jurisdiction not requiring a redetermination of facts; or (4) a change in law after the appeal affected the petitioner. (In re Dixon (1953) 41 Cal.2d 756, 759; In re Harris (1993) 5 Cal.4th 813, 828.)
>
> The substantive claims of prosecutorial misconduct normally could have been raised on appeal as evidence in support of those claims would have been in the record. Since those issues were not raised, they are barred on habeas corpus.

(Lodged Doc. 4 at 1).

1    Accordingly, Respondent asserts that the claim is procedurally barred in this court.

2  As a general rule, a federal court "'will not review a question of federal law decided by a state court

3  if the decision of that court rests on a state law ground that is independent of a federal question and

4  adequate to support the judgment.'" *Calderon v. United States District Court*, 96 F.3d 1126, 1129

5  (9th Cir. 1996) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).  An exception to the

6  general rule exists if the prisoner can demonstrate either cause for the default and actual prejudice

7  as a result of the alleged violation of federal law, or that failure to consider the claims will result in

8  a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 750.

9    Respondent bears the ultimate burden of proving a state procedural bar.  *See Bennett*

10  *v. Mueller*, 322 F.3d 573, 585 (9th Cir. 2003).  In order to bar federal habeas corpus review, the state

11  procedural rule must have been actually relied upon, clearly and expressly, in the state court order

12  in question.  *Coleman*, 501 U.S. at 735.  Here, it is apparent that the procedural bar at issue, applied

13  for failure to raise a claim on direct appeal, is independent of federal law.

14    **2.  MERITS**

15    Even if the claims of prosecutorial misconduct were not procedurally barred, their

16  merits would not warrant relief.  The law applicable to each of Petitioner's claims of prosecutorial

17  misconduct is the same.  On habeas corpus review, the narrow standard of due process applies.

18  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A prosecutor's error or misconduct does not, per

19  se, violate a criminal defendant's constitutional rights.  *See Jeffries v. Blodgett*, 5 F.3d 1180, 1191

20  (citing *Darden*, 477 U.S. at 181; *Cambell v. Kincheloe*, 829 F.2d 1453, 1457 (9th Cir. 1987)).  A

21  defendant's due process rights are violated only if the error or misconduct renders the trial

22  fundamentally unfair.  *Darden*, 477 U.S. at 181.

23    The question to be resolved is "whether the prosecutor's remarks 'so infected the trial

24  with unfairness as to make the resulting conviction a denial of due process.'" *Hall v. Whitley*, 935

25  F.2d 164, 165 (9th Cir. 1991) (quoting *Donnelly v. DeChritoforo*, 416 U.S. 637, 643 (1974)).  In

26  order to determine whether prosecutorial misconduct occurred, it is necessary to examine the entire

10

proceedings and place the prosecutor's remarks in context. *See Greer v. Miller*, 483 U.S. 756, 765-66 (1987). Factors to be considered in determining whether habeas corpus relief is warranted include whether the prosecutor manipulated or misstated the evidence; whether his comments implicated other specific rights of the accused; whether the objectionable content was invited or provoked by defense counsel's argument; whether the trial court admonished the jurors; and the weight of the evidence against the defendant. *Darden*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Relief is limited to cases in which the petitioner can establish that the misconduct resulted in actual prejudice. *Johnson v. Sublett*, 63 F.3d 926, 930 (1995) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)). In other words, prosecutorial misconduct violates due process when it has a substantial and injurious effect or influence in determining the jury's verdict. *See Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996).

### a. DIRECT EXAMINATION OF HENRIETTA RENO

Petitioner claims that the prosecutor misstated facts during the direct examination of witness Henrietta Reno, who was Petitioner's girlfriend at the time of the murder. Specifically, Petitioner contends that Reno never stated in any of her pre-trial interviews with Detective Poroli that Petitioner had hit her over the head with a gun during an altercation taking place between the two at some point in their relationship prior to the murder of John Huston. Reno later recanted the statements she made to Detective Poroli alleging that Petitioner had behaved in an abusive manner toward her during their relationship and implicating Petitioner in the murder. Reno claimed that she was lying during the initial interviews because she was angry at Petitioner. Petitioner thus alleges that the prosecutor's examination questions regarding whether Petitioner had actually ever hit Reno over the head with a gun misstated the evidence. According to Petitioner, the prosecutor's questions were prejudicial, misleading and confusing to the jury because the prosecutor posed each question as if it was a proven fact that Petitioner had hit Reno over the head with a gun. Petitioner claims that the prosecutor's allegedly improper line of questioning placed before the jury unsubstantiated evidence about Petitioner's propensity for violence with a gun.

Petitioner's claim that Reno never said that he hit her over the head with a gun must be viewed in light of Reno's pre-trial statements, the transcripts of which were admitted as trial exhibits, and Reno's subsequent trial testimony regarding the incident. On December 6, 2004, Reno telephoned Detective Poroli and claimed that Petitioner was responsible for the murder of John Huston. During this conversation, Reno described a prior altercation that had taken place between herself and Petitioner in which she claimed that "[he] beat me up really bad. I mean, I got my sister as a witness and everything, what he did to me, you know. He dragged me down the street. I had my nephew in my hand, my sister's child. And he's dragging me, you know, down the street, punching me, kicking me and shit with the gun on me." (CT at 506).

On the same day that she spoke to Detective Poroli on the phone, Reno went to the police station where the detective conducted a more exhaustive face to face interview. During this interview, Reno again told the detective that "one day  it just got really bad to where [Petitioner] punched me and dragged me down the street. In front of my sister's house while I was holding my sister's child in my hand. And he was six months at the time. And the neighbors come out, you know, are you - - asking me (unintelligible). I said leave him alone 'cause I know he has a gun." (CT at 516). Later on in the interview, Reno described the same incident to the detective as follows:

> MS. RENO:    And I was sitting over there and I was holding the baby and the next thing I know, I see [Petitioner] coming in the gate. And he grab [sic] me by my hair and I'm - - I - - I'm like, you know, what is it - - what are you doing? What's wrong with you? He was like I know  [you] did something. And I was like, what you talking about? You know, I never did nothing. What are you talking about? Next I knew he shocked me.  I dropped the baby, 'cause I, you know, I'm (unintelligible).  I lost my balance.  And he dragged [me] to where the baby's just sitting on the couch screaming. He dragged me all the way outside to the middle of the street and started kicking and punching. I'm running. Trying to run from him. I'm running up to people's door, nobody going to let me in. So - - 'cause I got some scratches on my legs and stuff to show.  But it was like - - probably about last month. But the scrapes are still there. You know?

DETECTIVE:          Uh-huh.

MS. RENO:    And then he dragged me and was punching [me] and
                  the neighbor came out that stayed in front.

(CT at 600-601).

Although Reno's description of the beating, as summarized above, does not clearly indicate that Petitioner hit her over the head with a gun, it is clear that Reno told the detective that she and Petitioner were involved in an altercation while she was holding her nephew either in her arms or hands.  During this altercation, Petitioner beat her badly, grabbed her by her hair, caused her to drop the baby, hit her and kicked her, and dragged her down the street.  Reno told the detective that Petitioner had a gun at the time the altercation occurred, and the beating occurred "with the gun on me."  (CT at 506).

Reno later recanted the above statements, claiming that she lied to the detective because she was angry with Petitioner.  Reno and Petitioner married in February 2005, prior to Petitioner's trial.  During one of Reno's visits to Petitioner while he was in jail awaiting trial she was caught passing a note to him asking that he tell her how she should testify at his trial.  At trial, Reno continued to claim that she lied in the statements she made to Detective Poroli on December 6, 2004.  The prosecutor questioned Reno extensively at trial regarding the contradictions between her earlier statements and her trial testimony.  With regard to the altercation between herself and Petitioner, Reno denied that Petitioner had ever beat her, testifying as follows:

Q.    Did you tell Detective Poroli, again in the same conversation,
      that ever since you split up with him, he's threatened you
      with a gun?

A.    That's what I told him.

Q.    Was that true or not true?

A.    Not true.

Q.    Okay.  Did you tell Detective Poroli again that you had seen
      him with two different kinds of guns?

A.    That's what I told him.

13

Q.   Didn't you tell Detective Poroli that on one occasion he beat you, not only with his fist, but he beat you over the head with a gun?

A.   I don't recall saying beat up on the side of the head with a gun, but yes, I did say that.

Q.   Did he beat you up?

A.   No.

Q.   Did you ever have a physical confrontation with him?

A.   No.

Q.   Never had?

A.   No.

Q.   Didn't you tell Detective Poroli that you were holding your sister's baby who was six months old, and he dragged you down the street?

A.   Yes.  I don't recall saying that I was holding my nephew when I got dragged down the street.

Q.   Your sister did have a baby, right?

A.   Yes, my sister did have a baby.

Q.   And, in fact, you told Detective Poroli on several occasions that he beat you up, and he hit you with a gun, right?

A.   No, I don't recall saying that.

Q.   Didn't you tell Detective Poroli that he beat you up?

A.   If that's what it says, that's what I said at the time, but I don't recall saying that, and no.

Q.   Let me come back to that later

. . . .

Q.   When you talked to the police back in December of 2004, you remember talking on the phone?

A.   Yes.

Q.   Didn't you tell them that you were afraid of him because he

14

1    had beaten you up before?

2    A.    That's what I told [Detective Poroli].

3    Q.    Weren't you scared when you made the phone call?

4    A.    No.

5    Q.    You weren't scared at all?

6    A.    I was arguing with him.

7    Q.    Didn't you also tell him that not only were you afraid of him
because he beat you up but because he had also beaten up
another girl, ex[-]girlfriend?

9    A.    No, I did not recall that.

10    Q.    All right.  You never told Detective Poroli that you are afraid
of him because he beat up his ex[-]girlfriend really bad?

11    A.    No.

12    Q.    Never said that?

13    A.    I don't recall, but if that's what the report says, that's what it
says.  But it's been so - - I don't - - no; no, I didn't.

15    Q.    Did he ever pistol whip you with a gun?

16    A.    No.

17    Q.    Did he ever hit you over the head with a gun?

18    A.    No.

19    Q.    And you told Detective Poroli that he did, right?

20    A.    Yes.

21    Q.    Did he ever drag you down the street while you were holding
your sister's baby?

22    A.    No.

23    Q.    You told Detective Poroli he did, right?

24    A.    Yes.

25    (RT at 367-370).  Thus, Reno's initial trial testimony was that she was unable to recall the specific

15

details she had told Detective Poroli regarding the prior altercation between herself and Petitioner. Reno denied that the altercation had actually ever taken place, but acknowledged that she had, in fact, conveyed to the detective that it had happened. Reno denied that Petitioner ever hit her over the head with a gun, however her testimony appears to be that she did initially tell Detective Poroli that Petitioner hit her over the head with a gun. In light of Reno's pre-trial statements to Detective Poroli and her trial testimony, Petitioner has failed to establish that the prosecutor misstated the facts of the case by examining Henrietta Reno regarding her inconsistent pre-trial statements and trial testimony.

Moreover, even if the prosecutor did misstate the facts regarding the altercation between Reno and Petitioner, specifically regarding Petitioner's use of a gun, Petitioner still does not establish prejudice. He has failed to demonstrate that the alleged misstatement rendered his trial fundamentally unfair or that there is a reasonable probability that the result of his trial would have been different absent the alleged misstatement. This is true because even absent the prosecutor's questioning of Reno regarding whether Petitioner hit her over the head with a gun, Reno's pre-trial statements nonetheless indicated that Petitioner used a gun during the altercation. (CT at 506). Petitioner does not now claim that the prosecutor committed misconduct by questioning Reno at trial about the beating in general, and none of the allegations raised in Petitioner's claim would have prevented the prosecutor from questioning Reno regarding Petitioner's use of the gun during the altercation between Reno and Petitioner. Thus, whether Petitioner beat Reno with his fists or with a gun was not a fact of such significance as to alter the jurors' ultimate verdict regarding whether Petitioner was guilty of murdering John Huston. Nor would the prosecutor have been prevented from questioning Reno regarding her inconsistent descriptions of the beating itself as it is clear that Reno described the altercation in several different ways during her initial statements to Detective Poroli and subsequently testified that the beating never happened.

For the reasons stated above, Petitioner is not entitled to federal habeas corpus relief with respect to this prosecutorial misconduct claim.

### b. REBUTTAL CLOSING ARGUMENTS

Petitioner claims that the prosecutor engaged in misconduct during rebuttal closing argument by misstating the trial testimony of Henrietta Reno and Beverly Tukes.  In considering claims of prosecutorial misconduct involving allegations of improper argument, the court is to examine the likely effect of the statements in the context in which they were made and determine whether the comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Turner*, 281 F.3d at 868; *Sandoval v. Calderon*, 241 F.3d 765, 778 (9th Cir. 2001).  In fashioning closing arguments, prosecutors are allowed "reasonably wide latitude," *United States v. Birges*, 723 F.2d 666, 671-72 (9th Cir. 1984), and are free to argue "reasonable inferences from the evidence." *United States v. Gray*, 876 F.2d 1411, 1417 (9th Cir. 1989).  *See also Ducket v. Godinez*, 67 F.3d 734, 742 (9th Cir. 1995).  "[Prosecutors] may strike 'hard blows,' based upon testimony and its inferences, although they may not, of course, employ argument which could be fairly characterized as foul or unfair." *United States v. Gorostiza*, 468 F.2d 915, 916 (9th Cir. 1972).

### i.    HENRIETTA RENO

Petitioner claims  that the prosecutor misstated facts during her rebuttal closing argument with respect to Reno's pre-trial statements to Detective Poroli.  Again, Petitioner contends that the prosecutor's misstated "the evidence of Petitioner beating Reno over the head with a gun while she was holding a baby." (Traverse at 16).  As previously stated, Petitioner has not proven that the prosecutor misstated the evidence with regard to Petitioner beating Reno over the head with a gun while she was holding her baby nephew.  Moreover, it is clear that Reno's testimony, quoted above, was that she did, in fact, tell Detective Poroli that Petitioner had beaten her over the head with a gun.  Based on this testimony, it cannot be said that the prosecutor misstated Reno's testimony in her rebuttal closing argument.  Moreover, even if the prosecutor's summary of Reno's testimony was inaccurate, Petitioner has failed to establish that the alleged misstatement rendered his trial fundamentally unfair.  As noted above, it is clear that Reno alleged in her pre-trial statement that Petitioner utilized a gun during the beating.  Whether Petitioner beat Reno with his fists and

merely used the gun to threaten her, or whether Petitioner used the gun to beat Reno is not a fact of such significant consequence that there is a reasonable probability that the result of his trial would have been different.

Petitioner is not entitled to federal habeas corpus relief on this prosecutorial misconduct claim.

### ii.     BEVERLY TUKES

Petitioner's final prosecutorial misconduct claim is that the prosecutor misstated the testimony of Beverly Tukes during her rebuttal closing statement as follows:

> Is it just a coincidence the observations by Beverly Tukes about what she saw in terms of [Petitioner] running to the house, a person with a beanie cap, and the beanie cap is dumped?  Henrietta Reno said he parked a bike at an abandoned house, and he got on the bike, he fell off, <u>he dropped the hat</u>, and that he scraped his hand.
>
> Is it just a coincidence that Beverly Tukes said the person she saw in her peripheral vision was running across 38th Street over by that [sic] he was wearing a white baseball cap that night, as other witnesses have said?

(Traverse at 19) (emphasis in original).  Petitioner argues that Tukes merely testified that after she heard gunshots fired, she witnessed a man wearing a beanie and hoodie running from the direction of American Legion High School.  Thus, according to Petitioner, the prosecutor improperly argued that Tukes testified that she saw a second person wearing a white baseball cap on the night of John Huston's murder.  Petitioner asserts further that the prosecutor's misstatement, specifically with regard to the white baseball cap,  was so misleading and prejudicial that he was deprived of his due process right to a fair trial.

Beverly Tukes did, in fact, testify that after hearing the gunshots fired she witnessed a man running towards her house from the direction of American Legion High School and that the man was wearing a beanie and some type of sweatshirt or hoodie.  (RT at 521, 526, 528).  In addition, Tukes testified that she saw a second man running from the direction of the high school down the street towards an abandoned house.  (RT at 516, 518, 519, 538, 539).  Petitioner, however,

misquotes the portion of the prosecutor's rebuttal closing statement that he now challenges.  In fact, the prosecutor's argument was as follows:

> Is it just a coincidence the observations by Beverly Tukes about what she saw in terms of [Petitioner] running to the house, a person with a beanie cap, and the beanie cap is dumped?  Henrietta Reno said he parked a bike at an abandoned house, and he got on the bike; he fell off, he dropped his hat, and that he scraped his hand.
>
> Is it just a coincidence that Beverly Tukes said the person she saw in her peripheral vision was running across 38th Street *over by that abandoned house?  Is it a coincidence that he was wearing a white baseball cap that night, as other witnesses have said?*  Is it a coincidence that his hand wasn't hurt when he got shot, ladies and gentlemen, on September 2nd?  Because Henrietta Reno did tell you when she was here on the stand that he did hurt his hand, and it healed.  But she tried to tell you that happened when he was shot.

(RT at 847-48) (emphasis added to portion of quote omitted from Petitioner's petition).  Thus, the prosecutor's argument, "[i]s it just a coincidence the observations by Beverly Tukes about what she saw in terms of [Petitioner] running to the house, a person with a beanie cap, and the beanie cap is dumped?"was a proper characterization of Tukes' trial testimony.

Petitioner's contention that the prosecutor improperly argued that Tukes testified that she saw a second man wearing a white baseball cap running across 38th Street, however, is incorrect in the context of the omitted portion of the prosecutor's argument.  After arguing that Tukes witnessed a person wearing a beanie cap on the night of the murder, the prosecutor went on to argue "[i]s it just a coincidence that Beverly Tukes said the person she saw in her peripheral vision was running across 38th Street over by that abandoned house?  Is it a coincidence that he was wearing a white baseball cap that night, *as other witnesses have said*?"  (RT at 847-48) (emphasis added).  A reasonable reading of the prosecutor's argument leads to the conclusion that the prosecutor did not attribute testimony regarding the person in the white hat to Tukes, but rather to the testimony of other witnesses.  Indeed, both Belyn Johnson and Latosha Brooks testified that Petitioner was wearing a white baseball hat on the night of the murder.  (RT at 197, 300).  Petitioner's claim that the prosecutor misstated the testimony of Beverly Tukes is without merit.

Moreover, even if the prosecutor's argument was improper, it did not rise to the level of a constitutional violation because Petitioner has failed to establish that the alleged misstatement rendered his trial fundamentally unfair.  Respondent persuasively argues that the prosecutor accurately referenced Beverly Tukes' testimony regarding the beanie, and other witnesses did testify that Petitioner was wearing a white baseball cap on the night of the murder.  (RT at 197, 300). Because testimony that Petitioner was wearing a white baseball on the night of the murder was already before the jury, it is unlikely that the prosecutor's alleged misstatement could have had a substantial and injurious effect on the jury's verdict.  *See Brecht*, 507 U.S. at 637; *Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004) (applying *Brecht* standard to claim of prosecutorial misconduct in closing argument).

Petitioner is not entitled to federal habeas corpus relief with respect to this prosecutorial misconduct claim.

**B.  INEFFECTIVE ASSISTANCE OF COUNSEL**

Petitioner claims that trial counsel rendered prejudicially ineffective assistance by a) failing to investigate and prepare for trial; b) failing to investigate and call witnesses; c) failing to object to acts of prosecutorial misconduct, and d) failing to present favorable defense evidence. In addition, Petitioner claims that appellate counsel rendered prejudicially ineffective assistance by failing to present Petitioner's ineffective assistance of trial counsel and prosecutorial misconduct claims on direct appeal.

**1.  TRIAL COUNSEL**

The Sixth Amendment to the United States Constitution guarantees to a criminal defendant the effective assistance of counsel.  The United States Supreme Court set forth the test for determining whether counsel's assistance was ineffective in *Strickland v. Washington*, 466 U.S. 668 (1984).  To support a claim that counsel's performance was ineffective, a petitioner must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  *Id* at 687-88.  After a petitioner identifies the acts or omissions that are alleged

not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. *Id*. at 690; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). Second, a petitioner must establish that he was prejudiced by counsel's deficient performance. *Strickland*, 466 U.S. at 693-694. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id*. *See also Williams v. Taylor*, 529 U.S. 362, 391-92 (2000); *Laboa v. Calderon*, 224 F.3d 972, 981 (9th Cir. 2000).

A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies....If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice...that course should be followed." *Pizzuto v. Arave*, 280 F.3d 949, 955 (9th Cir. 2002) (citing *Strickland*, 466 U.S. at 697). In assessing an ineffective assistance of counsel claim, "[t]here is a strong presumption that counsel's performance falls within the 'wide range of professional assistance.'" *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). There is, in addition, a strong presumption that counsel "exercised acceptable professional judgment in all significant decisions made." *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990) (citing *Strickland*, 466 U.S. at 689). Thus, a reasonable tactical decision by counsel with which the defendant disagrees cannot form the basis of an ineffective assistance of counsel claim. *Strickland*, 466 U.S. at 689. The court does not consider whether another lawyer with the benefit of hindsight would have acted differently than trial counsel. *Id*. Instead, the court considers whether counsel made errors so serious that counsel failed to function as guaranteed by the Sixth Amendment. *Id*. at 687.

/////

/////

/////

### a.  FAILURE TO INVESTIGATE AND PREPARE FOR TRIAL

Petitioner claims that trial counsel rendered ineffective assistance by failing to adequately investigate and prepare for trial.  Specifically, Petitioner contends that counsel failed to file a pre-trial discovery motion, despite that the prosecution filed a motion for pre-trial discovery. Moreover, Petitioner claims that counsel conducted no independent investigation in relation to his case.  Petitioner acknowledges that he does not allege with specificity what information counsel should have discovered had he conducted pre-trial investigation or filed a pre-trial discovery motion, but he argues that his failure to allege specific facts does not prevent the court from granting him habeas corpus relief on this claim.  Respondent, on the other hand, argues that Petitioner has not demonstrated that trial counsel's performance was either deficient or prejudicial to the defense because he has failed to specifically identify what information trial counsel failed to obtain via pre-trial discovery motion or investigation.  The Sacramento County Superior Court considered and rejected this claim on collateral review, explaining its reasoning as follows:

> Petitioner claims that trial counsel failed to file a discovery motion. Since Petitioner does not identify what information was not disclosed that would have been revealed if counsel had filed such a motion, he has not shown that counsel's conduct was unreasonable.

(Lodged Doc. 4 at 2).

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "This includes a duty to . . . investigate and introduce into evidence records that demonstrate factual innocence, or that raise sufficient doubt on that question to undermine confidence in the verdict." *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001) (citing *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999)).  In this regard, it has been recognized that "the adversarial process will not function normally unless the defense team has done a proper investigation."  *Siripongs v. Calderon*, 133 F.3d 732, 734 (9th Cir. 1998) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986)).  Therefore, counsel must, "at minimum, conduct a reasonable investigation enabling him to make informed

decisions about how best to represent his client." *Hendricks v. Calderon*, 70 F.3d 1032, 1035 (9th Cir. 1995) (quoting *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994) (internal citations and quotations omitted)).  On the other hand, where an attorney has consciously decided not to conduct further investigation because of reasonable tactical decisions, his or her performance is not constitutionally deficient.  *See Siripongs*, 133 F.3d at 734; *Babbitt v. Calderon*, 15 F.3d 1170, 1173 (9th Cir. 1998); *Hensley v. Crist*, 67 F.3d 181, 185 (9th Cir. 1995).  "A decision not to investigate thus 'must be directly assessed for reasonableness in all circumstances.'" *Wiggins*, 539 U.S. at 533 (quoting *Strickland*, 466 U.S. at 691).  *See also Kimmelman*, 477 U.S. at 385 (counsel "neither investigated, nor made a reasonable decision not to investigate"); *Babbitt*, 151 F.3d at 1173-74.  A reviewing court must "examine the reasonableness of counsel's conduct 'as of the time of counsel's conduct.'" *United States v. Chambers*, 918 F.2d 1455, 1461 (9th Cir. 1990) (quoting *Strickland*, 466 U.S. at 690).  Moreover, "'ineffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case.'" *Bragg*, 242 F.3d at 1088 (quoting *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986)).

Here, the decision of the Sacramento County Superior Court rejecting Petitioner's claim is not contrary to or an unreasonable application of federal law, nor is it based on an unreasonable determination of the facts.  Petitioner has not demonstrated that counsel conducted no pre-trial investigation, nor has he alleged what information trial counsel failed to obtain by filing a pre-trial discovery motion or conducting pre-trial investigation or how that information would have favorably impacted the result of his case.[4]  To the contrary, Petitioner claims that he need not

---

[4] Petitioner suggests, in footnote eight of his traverse, that counsel, via pre-trial motion for discovery, could have requested DNA testing of hair and saliva samples given by Petitioner, learned what type of deal witness Deana Randle received in exchange for her testimony, and learned whether witness Brenda Huston had a prior conviction for perjury.  First, the record reflects that the trial court granted a prosecution motion to compel Petitioner to give a hair and saliva sample for the purposes of DNA testing.  (CT at 1).  The record does not reflect the results of the testing or that any DNA evidence was introduced at trial, but Petitioner fails to demonstrate that such testing did not take place.  Next, Petitioner's counsel examined witness Randle extensively at trial regarding whether she received any deal in exchange for her testimony against Petitioner, demonstrating counsel's awareness that Randle may have been motivated to testify falsely in exchange for

specify facts in support of his claim to obtain federal habeas corpus relief.  Moreover, although Petitioner alleges that he provided trial counsel with various "leads" which he asserts counsel should have investigated, he once again fails to specify what those "leads" were or how trial counsel's investigation of those "leads" would have affected the outcome of his case.  Nor does Petitioner explain how his decision to proceed to trial or his defense was harmed by trial counsel's alleged deficiencies.  Accordingly, Petitioner has failed to allege, let alone establish, prejudice.  *See Bragg*, 242 F.3d at 1088 (no ineffective assistance of counsel where the petitioner did "nothing more than speculate that, if interviewed, a witness might have given helpful information"); *Jonas v. Gomez*, 66 F.3d 199, 204 (9th Cir. 1995) ("conclusory allegations which are not supported by a statement of specific facts do not warrant habeas [corpus] relief"); *United States v. Berry*, 814 F.2d 1406, 1409 (9th Cir. 1987) (appellant failed to satisfy the prejudice prong of an ineffective assistance claim because he offered no indication of what testimony potential witnesses would have offered or how their testimony might have changed the outcome of the hearing); *Eggleston*, 798 F.2d at 376 (no ineffective assistance where defendant fails to state what additional information would be gained by discovery he claims was necessary and record shows trial counsel was well-informed).  Petitioner is not entitled to federal habeas corpus relief on this claim.

### b.  FAILURE TO INVESTIGATE AND CALL WITNESSES

Petitioner claims that his trial counsel failed to investigate, interview, and call to testify the following witnesses: Akintunde Kambon ("Tunde"),[5] Jahontay Ponygan ( "Little Dad"), Lesley Davis ("Diamond"), Dion Curry, Veronica Brooks and Masada Pongyan.[6]  Petitioner claims

---

favorable treatment in an unrelated case, (CT at 643-653), and counsel presented this argument to the jury in his closing statement (CT at 827-828).  Finally, the trial brief filed by Petitioner's trial counsel clearly reflects that counsel was aware that witness Huston had a prior perjury conviction which was later set aside. (CT at 266).

[5] Tunde is Petitioner's brother.

[6] In Henrietta Reno's initial statements to Detective Poroli on December 6, 2004, she claimed that Tunde and Little Dad were at American Legion High School with Petitioner at the time he murdered John Huston.  As previously discussed, Reno later recanted these statements.

that he informed counsel that some of these witnesses would testify on his behalf, but counsel failed to send an investigator to speak with them.  Petitioner also claims that some of these witnesses were identified in the police report and provided statements to the police that appeared to be favorable to Petitioner's case.  Specifically, Petitioner claims that Tunde would have testified that he was not with Petitioner on the night of the murder, disproving the prosecution's theory of the case.[7] Petitioner also claims that Little Dad would have testified that he was on the street the night of the murder, but never saw Petitioner, Tunde, or Henrietta Reno.  In addition, Little Dad would allegedly have testified that he heard no shots fired and did not run away from the murder scene as the prosecutor had theorized.  Petitioner notes that the prosecutor emphasized the absence of Tunde's and Little Dad's testimony in her closing statement as follows:

> And I ask you, ladies and gentlemen, two questions: One, where's Tunde; two, where's Little Dad?  Where's Tunde and Little Dad to tell you they were never with Snoop[8] that night, never saw him, never saw him on 38th Street, never saw him encounter Mack J,[9] never saw him walk off across the grass, never saw him put a gun to the young man's side, never saw him kiss his head, never saw him make him take his shoes off, never forced him to the back of that school, never heard Mack J begging for his life, never saw him with a 9-millemeter that night, never saw him make him sit down and take his socks off.

(RT at 851).  Petitioner claims that the remaining alleged witnesses would have testified that they did not see Petitioner near the murder scene.

The Sacramento County Superior Court rejected Petitioner's claim on collateral review, explaining its reasoning as follows:

> A petition alleging ineffective assistance of counsel based on the failure to obtain favorable evidence must show what evidence should

---

[7] It appears that the prosecution's theory of the case mirrored Henrietta Reno's initial December 6, 2004 statements to Detective Poroli in which she claimed that Tunde, Little Dad, and Petitioner were together at American Legion High School when the murder took place.  According to Reno's statement, Petitioner forced John Huston to take off his shoes, walk across the grass, and sit down.  In addition, Reno claimed that Tunde originally intended to shoot John Huston, however Tunde got scared.  Instead, Petitioner grabbed the gun from Tunde and shot Huston himself.

[8] Petitioner is also known as "Snoop."

[9] The murder victim, John Huston, was also known as "Mack J."

> or could have been obtained and what effect it would have had. (People v. Geddes, (1991) 1 Cal.App.4th 448, 454.)
>
> Petitioner argues that counsel never interviewed six identified witnesses. Petitioner does not attach evidence of how these witnesses would have testified or explain how their testimony would have been helpful to his case. Therefore, he has not shown that the failure to interview or call these people to testify was improper.

(Lodged Doc. 4 at 2).

The state court decision is not contrary to or an unreasonable application of clearly established federal law. First, there is no rule requiring an attorney to interview all prospective witnesses. *Bragg*, 242 F.3d at 1088 ("'the duty to investigate and prepare a defense is not limitless: it does not necessarily require that every conceivable witness be interviewed'") (quoting *Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995)). Petitioner's conclusory allegations that the above six witnesses would have provided favorable trial testimony do not demonstrate that trial counsel was ineffective. *See id.* (no ineffective assistance where petitioner did "nothing more than speculate that, if interviewed," a witness might have given helpful information); *United States v. Harden*, 846 F.2d 1229, 1231-32 (9th Cir. 1988) (no ineffective assistance because of counsel's failure to call a witness where, among other things, there was no evidence in the record that the witness would, in fact, testify). Petitioner claims he has contacted all the listed witnesses, all of whom have indicated that they would be willing to help him. However, the burden of demonstrating ineffective assistance of counsel cannot be met without showing that these witnesses would be willing to testify. This burden may be satisfied by providing the court with affidavits from each potential witness showing what their testimony would have been. *Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000). No such affidavits have been supplied by Petitioner in this case. Moreover, even if each of these witnesses testified as Petitioner claims they would have, there is no indication that the outcome of Petitioner's trial would have been different. Indeed, Petitioner does not claim that any of these witnesses would have provided alibi testimony at his trial. At most, Little Dad and Tunde would have testified that they were not with Petitioner when the murder occurred and the rest of the asserted witnesses would

have testified that they did not see Petitioner in the area surrounding American Legion High School in Oak Park on the night of the murder.  This proposed testimony would not have conflicted with the Henrietta Reno's initial statements to the police, or the testimony of Deana Randle.  Indeed, both Reno's initial statements and Randle's testimony implicated Petitioner in the murder, as each claimed that he admitted that he committed the murder and that he had described his participation the crime, in varying detail, to each of them.  *C.f. Lord v. Wood*, 184 F.3d 1083, 1085 (9th Cir. 1999) (petitioner's ineffective assistance claim granted where counsel failed to personally interview witnesses whose testimony, if believed, would have cleared petitioner of murder).  Petitioner is not entitled to federal habeas corpus relief on this claim.

### c. FAILURE TO OBJECT TO ACTS OF PROSECUTORIAL MISCONDUCT

Petitioner claims that trial counsel was ineffective for failing to object to the prosecutor's misstatement of facts during direct examination of Henrietta Reno and during rebuttal closing argument when referencing Reno's initial statements to police.  The Sacramento County Superior Court considered and rejected Petitioner's claim on collateral review, explaining its reasoning as follows:

> . . . Henrietta Reno telephoned Sacramento Police Detective Michael Poroli on December 6, 2004 and said that Petitioner killed John Huston, the victim.  Reno went to the police station and gave a statement.  On December 16, she recanted the statements.  In February 2005, Reno and Petitioner married.  Shortly before trial, Reno passed Petitioner a note indicating that Petitioner should tell Reno how she should testify.

> During rebuttal argument, the prosecutor states: "Henrietta Reno told the detective on repeated occasions that [Petitioner] beat her up, dragged her down the street.  He hit her over the head with a gun while she was holding her sister's six-month-old baby." (Exhibit B; RT 844.)  Petitioner contends that there was no evidence to support the prosecutor's statement.  As proof, he attaches the transcript of two statements made by Reno.  First, since Petitioner has only attached one page of transcript of the closing argument, in which the above-quoted statement was at the bottom, Petitioner has not shown that trial counsel failed to object.  Second, even if counsel failed to object, Petitioner has not shown that the prosecutor misstated the evidence.  The first statement (a telephone conversation on December 6, 2004) makes reference to a time when Reno had her nephew in her

27

hands and Petitioner dragged her down the street punching her, kicking her and with a gun on her. (Exhibit C at p.11.) The second statement (an interview on December 6, 2004) refers to the same incident which Reno describes as follows: she was holding her sister's baby and Petitioner grabbed her by the hair; she dropped the baby when she lost her balance and Petitioner dragged her outside and kicked and punched her. (Exhibit C at pp. 105-106.) Although neither of these statements made specific references to Petitioner hitting Reno on the head with a gun, Reno made a third statement to Detective Poroli on December 6, 2004. According to the court's minutes, the tape of a statement made in the afternoon was played to the jury and a transcript of that interview was also admitted into evidence during trial. Since Petitioner has not attached a copy of that second interview/third statement, he has not shown that the prosecutor's rebuttal argument misstated the evidence regarding Petitioner's conduct towards Reno.

(Lodged Doc. 4 at 3).

In addition, Petitioner claims that trial counsel was ineffective for failing to object to the prosecutor's alleged misstatement during rebuttal closing argument regarding the trial testimony of Beverly Tukes. The Sacramento County Superior Court considered and rejected Petitioner's claim on collateral review, explaining its reasoning as follows:

Beverly Tukes testified that she heard gunshots coming from American Legion High School (where the victim's body was later discovered) on the night of the murder. She saw two people running across 38th Street. One ran towards her, said he was running because of the shooting, and tried to get into a neighbor's house. (Other evidence was presented that Petitioner was a friend of the two people who lived in that house.) Tukes described the person as black, with a man's voice. He was wearing dark clothing and a beanie cap. (Exhibit E; RT 521.) Later, the prosecutor argued, "Is it just a coincidence the observations by Beverly Tukes about what she saw in terms of him running to the house, a person with a beanie cap, and the beanie cap is dumped? . . . Is it just a coincidence that Beverly Tukes said the person she saw in her peripheral vision was running across 38th Street over by that abandoned house? Is it just a coincidence that he was wearing a white baseball cap that night, as other witnesses have said?" (Exhibit D; RT 847.)

Petitioner now argues that there was no evidence that she saw a person wearing a white baseball cap. While she did testify that the person she saw was wearing a beanie cap, it does not appear that she ever described the color as white. However, Petitioner has not shown that trial counsel's failure to object to this misstatement of fact constituted ineffective assistance of counsel. First, like the above transcript, Petitioner has only attached the page containing the

28

prosecutor's statement. In the absence of at least the following page, it cannot be determined whether trial counsel objected to the statement. Second, Petitioner has not shown that the failure to object was not a tactical choice. Third, even if the failure to object was unreasonable, Petitioner has not shown that counsel's inaction resulted in prejudice. The opinion on appeal characterized the numerous witnesses' testimony as "overwhelming evidence of [Petitioner's] guilt." In addition, the prosecutor's statement shows that other witnesses identified Petitioner as wearing a white baseball cap. Therefore, the reference to Tuke's testimony was cumulative. Finally, the jury was instructed that "statements made by the attorneys during the trial are not evidence" and it is presumed that the jury followed the instructions. Therefore, Petitioner has not shown that an objection to the prosecutor's misstatement likely would have led to a different result.

(Lodged Doc. 4 at 4).

The state court decisions rejecting Petitioner's ineffective assistance of counsel claims based on trial counsel's failure to object to the alleged acts of prosecutorial misconduct are not contrary to or an unreasonable application of clearly established federal law. The merits of each of the three prosecutorial misconduct claims forming the basis for Petitioner's ineffective assistance of counsel claim have been discussed extensively and rejected in subsection (V)(A), above. It was already concluded that the prosecutor did not commit misconduct by making misstatements, and that even assuming arguendo that the prosecutor did make the alleged misstatements, Petitioner did not suffer any prejudice. For the same reasons, it cannot be concluded that trial counsel's failure to object to the alleged acts of prosecutorial misconduct had a substantial or injurious effect or influence in determining the jury's verdict.

Petitioner is not entitled to federal habeas corpus relief with respect to this ineffective assistance of counsel claim.

### d. FAVORABLE EVIDENCE

Petitioner contends that trial counsel was ineffective for failing to present favorable evidence in support of Petitioner's defense. Specifically, Petitioner claims that trial counsel failed to present evidence that a cell phone number attributed to him was not actually his, evidence of a letter written by Henrietta Reno to Petitioner explaining the reasons she made false statements to

Detective Poroli, evidence that Deana Randle's pre-trial statements were inconsistent with her trial testimony, and evidence of Brenda Huston-Zeno's perjury conviction.  The Sacramento County Superior Court considered and rejected this claim on collateral review, explaining its reasoning as follows:

> Petitioner complains that trial counsel did not present an active defense, calling no witnesses and presenting only one piece of documentary evidence.  However, Petitioner does not identify what evidence should have been presented, except for the selected items discussed below.  Petitioner's general argument that trial counsel failed to present "mitigating" evidence is without merit.
>
> 1.  Call Records
>
> The prosecutor apparently presented evidence of Petitioner's call records during trial, attributing to him the phone number 916-308-2912.  Petitioner claims that trial counsel should have presented his parolee report showing that his phone number was 916-690-5806.  First, the fact that Petitioner listed his phone number on a report would likely be inadmissible hearsay.  Second, even if admissible, the fact that Petitioner had a "home" phone number does not preclude him from also having the cellular phone number attributed to him by the prosecutor.  Petitioner has not shown that the failure to present evidence of Petitioner's phone number was unreasonable.
>
> 2.  Reno's Letter
>
> Petitioner contends that trial counsel failed to present evidence of a letter that Reno wrote to Petitioner, explaining why she lied when she told Detective Poroli that Petitioner killed Huston.  The attached letter (Exhibit E) states that Reno lied out of anger at Petitioner for cheating on her.  At trial, Reno testified that her out-of-court statements incriminating Petitioner were lies motivated by jealousy over Petitioner's relationship with Deana Randle.  Since Reno testified to the same information that was contained in the letter, the letter would have been redundant and inadmissible as hearsay.  Trial counsel acted properly in not presenting the letter as evidence.
>
> 3.  Randle's Statements
>
> Deana Randle testified that Petitioner told her that he killed someone at American Legion High School, which had been in the news.  She admitted that she talked to the District Attorney and asked that they talk to Fresno County about Randle's probation violation.  Petitioner's trial counsel cross-examined Randle about her motivation for making the statement, implying that she would have done anything to avoid jail time for her probation violation because her children were out of her custody.  Petitioner argues that counsel

30

should have also questioned Randle about a previous statement made to detectives in which Randle stated that Petitioner never told her about any murder and that she never saw him with a gun. This statement was apparently made in December 2004. During cross-examination, counsel asked Randle, "you also told the police that you didn't know anything about this murder, correct." Randle responded that she did. When counsel further asked, "you said that you never saw him with a gun before and that he didn't discuss that stuff with you, right?" Randle agreed with that as well. (Exhibit I; RT 640-641.) Since Randle was cross-examined and admitted that she previously told detectives that Petitioner had not made incriminating statements, the prior statement would not have been admissible.

4. Impeachment of Huston

Petitioner argues that Brenda Huston-Zeno should have been impeached with a conviction for perjury. He has not attached any evidence that she was convicted. While Petitioner has attached a copy of a motion which relates that she was *arrested* for perjury, she was not convicted of that offense. Therefore, Petitioner has not shown that counsel should have impeached Huston.

(Lodged Doc. 4 at 4-6.) The state court's rejection of Petitioner's ineffective assistance claim based on the failure to present what Petitioner alleges to be favorable defense evidence was not contrary to or an unreasonable application of clearly established federal law.

First, Petitioner fails to provide any evidence in support of his claim that the phone number attributed to him at trial was not his but, in fact, belonged to his brother. Petitioner's claim that counsel provided ineffective assistance by failing to present evidence in this regard is wholly conclusory and thus an insufficient basis for habeas corpus relief. *See Jones v. Gomez*, 66 F.3d 199 (9th Cir. 1995) (conclusory allegations that counsel provided ineffective assistance "fall far short of stating a valid constitutional violation") (citing *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994)); *Boehme v. Maxwell*, 423 F.2d 1056, 1058 (9th Cir. 1970) ("[a]llegations of fact, rather than conclusions, are required"). In the absence of any evidence to the contrary, there is a strong presumption that counsel's performance was competent. *Kimmelman v. Morrizon*, 477 U.S. 365, 381 (1986). Petitioner is not entitled to federal habeas corpus relief on this ineffective assistance claim.

Second, as noted by the state court, Henrietta Reno testified at trial and Petitioner's

31

trial counsel questioned her extensively regarding the reasons why she claimed she initially lied to police about Petitioner's involvement in the murder of John Huston and why she later recanted her statements. (RT at 476-484). Thus, presentation of the letter would have been cumulative of Reno's trial testimony. In addition, this letter was an out of court statement which Petitioner now claims should have been offered to prove that Reno's statements to the police were false. The letter is unauthenticated and the circumstances under which the letter was written provide no indicia of reliability or trustworthiness. Indeed, the record demonstrates that the letter was written during a time period in which Reno gave statements to police, then attempted to recant those statements to the police, and was subsequently caught passing Petitioner a note in jail asking him to tell her how to testify at his trial. Accordingly, the letter constituted inadmissible hearsay. CAL. EVID. CODE § 1200. Petitioner does not now contend that any applicable hearsay exception under the California Evidence Code would have rendered the letter admissible at his trial. A criminal defendant "does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (citing *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)). In addition, Petitioner has failed to demonstrate prejudice because he does not explain how admission of this letter, particularly in light of the fact that Reno's trial testimony placed the same evidence in front of the jury, would have impacted the outcome of his trial. Accordingly, Petitioner is not entitled to relief on his claim that counsel was ineffective for failing to introduce evidence of Reno's letter at trial.

Third, Petitioner's claim that trial counsel should have impeached the testimony of Deana Randle with her prior inconsistent statements is without merit. As the state court set forth, Randle testified at trial that Petitioner told her that he killed someone at American Legion High School. Petitioner's trial counsel then examined Randle extensively regarding her whether she received a deal in exchange for her testimony against Petitioner. In addition, counsel questioned Randle as follows:

> Q.    Now, you also told the police that you didn't know anything

1     about this murder, correct?

2     A.    Yes, I did.

3     Q.    And they asked you about a gun, and you said that you never saw him with a gun before and that he didn't discuss that stuff with you, right?

5     A.    I told him that.  That's what I was told to say, yeah.

6     Q.    Okay.

7     . . . .

8     Q.    So you were asked, "Have you ever seen him with a gun," and you said, "No"?

9     A.    Yeah.  That's what I was told to say.

10    Q.    And you said "Never"?

11    A.    Probably, yeah.

12    Q.    "At my house? No; Anywhere? No"?

13    A.    Yeah.  I was doing what I was told.  That's all.  I didn't want to be in no mess.

15    Q.    Ok.  So - - and now you're saying you have seen him with a gun, but it was a revolver, right?

16          MS. SHUBERT:    Objection; misstates the testimony.

17          THE COURT:    It does.  I can allow the question for the purposes of testing the original statement.  You may answer.

19          THE WITNESS:    Could you repeat it?

20    Q.    (By Mr. McEwan) Now you are telling us that that was a lie, and you have seen him with a revolver, correct?

22    A.    Yes. I've seen him with a revolver.

23    Q.    You've seen him with a revolver?

24    A.    Plenty of times.

25    Q.    And you made a joke about it, about the fact that the revolver - - he was going to lose if he had a revolver, correct?

26

A.    Yeah.  I told him that personally.

Q.    And it is your testimony today that you saw him with a different gun?

A.    Yes, I have.

(RT at 640-643).  Thus, the jury was aware that Randle made prior statements inconsistent with her trial testimony.  In addition, trial counsel's extensive questioning and subsequent closing argument regarding the circumstances of Randle's decision to change her statement and testify against Petitioner indicates counsel's awareness that Randle may have been motivated to testify falsely in exchange for favorable treatment in an unrelated case.  (RT at 643-653, 827-828).  Petitioner does not explain what further information trial counsel should have presented to impeach Randle's testimony, nor does he explain how that information would have impacted the results of his trial.  Accordingly, Petitioner has failed to demonstrate either prong of *Strickland*, that trial counsel's performance was deficient or that he suffered any prejudice as a result of the alleged error.  Petitioner is not entitled to federal habeas corpus relief on his claim that counsel was ineffective for failing to present evidence of Deana Randle's prior inconsistent statements.

Finally, Petitioner claims that trial counsel should have impeached Brenda Huston-Zeno with evidence of her prior perjury conviction.  Petitioner, however, has failed to demonstrate that Huston-Zeno suffered a prior perjury conviction, or any conviction that would have been admissible as impeachment evidence at his trial.  While the record reflects that Huston-Zeno was arrested in 1981 for a violation of section 118 of the California Penal Code (perjury) and section 11483 of the California Welfare and Institutions Code in 1981 (fraud in obtaining aid for a child), she  was convicted of only the latter offense and that conviction was set aside in 1987, pursuant to section 1203.4 of the California Penal Code.  Moreover, although a defendant witness in a criminal case may be impeached with evidence of a conviction set aside pursuant to section 1203.4, an ordinary witness in a criminal or civil trial may not be impeached with such a conviction.  CAL. PENAL § 788.  Huston-Zeno was not a defendant in this case, thus evidence of her prior conviction

for fraud in obtaining aid for a child was inadmissible.  Petitioner presents no reliable evidence in support of his conclusory allegation that Huston-Zeno in fact suffered a conviction for perjury which should have been presented by trial counsel as impeachment evidence.  Accordingly, trial counsel could not have provided prejudicially ineffective assistance by failing to impeach Huston-Zeno with a non-existing conviction.  Petitioner is not entitled to federal habeas corpus relief on this claim.

## 2.  APPELLATE COUNSEL

Petitioner claims that appellate counsel rendered prejudicially ineffective assistance by failing to raise meritorious claims on direct appeal.  According to Petitioner, he wrote several letters to appellate counsel informing him of claims he considered meritorious and wanted to pursue on appeal.  Counsel, however, only presented one appellate claim.  Specifically, Petitioner claims that appellate counsel should also have presented the previously discussed ineffective assistance of trial counsel and prosecutorial misconduct claims.  The Sacramento County Superior Court considered and rejected Petitioner's ineffective assistance of appellate counsel claim on collateral attack, explaining its reasoning as follows:

> A petitioner seeking relief by way of habeas corpus has the burden of stating a prima facie case.  (In re Bower (1985) 38 Cal.3d 865, 872.)  A petition for writ of habeas corpus should attach as exhibits all reasonably available documentary evidence or affidavits supporting the claim.  (People v. Duvall (1995) 9 Ca.4th 464, 474.)  To show constitutionally inadequate assistance of counsel, a defendant must show that counsel's representation fell below an objective standard and that counsel's failure was prejudicial to defendant.  (In re Alvernaz (1992) 2 Cal.4th 924, 937.)  Actual prejudice must be shown, meaning that there is a reasonable probability that, but for the attorney's error(s), the result would have been different.  (Strickland v. Washington (1984) 466 U.S. 668, 694.)  Appellate counsel performs "properly and competently when he or she exercises discretion and presents only the strongest claims instead of every conceivable claim."  (In re Robbins (1998) 18 Ca.4th 770, 810.)
>
> Petitioner's conviction of first-degree murder with a firearm use enhancement was affirmed on appeal in May 2007 and became final in July 2007.  Petitioner's previous [state habeas corpus] petition (case number 08F03036) raised claims of prosecutorial misconduct and ineffective assistance of trial counsel.  The claims of prosecutorial misconduct were denied on the grounds that they were procedurally barred after not being raised on appeal.  Petitioner now

claims [in a subsequent state habeas corpus petition] that appellate counsel was ineffective for failing to raise the claims of prosecutorial misconduct on appeal. First, the petition does not identify the alleged acts of misconduct. However, based on the claims in the previous petition, it appears that the claims are that the prosecutor misstated evidence regarding Henrietta Reno's and Beverly Tukes's testimony. Second, there is no indication that trial counsel objected to the alleged misstatements. To the contrary, the previous petition indicates that trial counsel did not object. Normally, trial counsel must object to misconduct and request and admonition to preserve the claim on appeal. (See People v. Alfaro (2007) 41 Cal.4th 1277, 1328.) Only if an admonition would not have cured the harm, may a claim be raised on appeal absent an objection at trial. Since Petitioner has not shown that an admonition about the prosecutor's misstatement of the facts would not have cured the harm, he has not shown that appellate counsel's conduct was improper.

(Lodged Doc. 8 at 1-3).

The *Strickland* standards discussed above apply to appellate counsel as well as trial counsel. *Smith v. Murray*, 477 U.S. 527, 535-36 (1986); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989). An indigent defendant "does not have a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." *Jones v. Barnes*, 463 U.S. 745, 751 (1983).[10] "Counsel must be allowed to decide what issues are to be pressed." *Id.* Otherwise, the ability of counsel to present the client's case in accord with counsel's professional evaluation would be "seriously undermined." *Id. See also Smith v. Stewart*, 140 F.3d 1263, 1274 n.4 (9th Cir. 1998) (Counsel was not required to file "kitchen-sink briefs" because it "is not necessary, and is not even particularly good appellate advocacy."). There is, of course, no obligation to raise meritless arguments on a client's behalf. *See Strickland*, 466 U.S. at 687-88 (requiring a showing of deficient performance as well as prejudice). Thus, counsel is not deficient for failing to raise a weak issue. *See Miller*, 882 F.2d at 1434. In order to demonstrate prejudice in the appellate context, Petitioner must show that, but for appellate

---

[10] The record reflects that Petitioner was represented by a public defender at trial. On appeal, he was represented by court appointed counsel and the Central California Appellate Program, a non-profit law office dedicated to indigent representation in criminal, juvenile, dependancy and mental health appeals.

counsel's errors, he would likely have prevailed on appeal.

The merits of each of the individual ineffective assistance of trial counsel and prosecutorial misconduct claims forming the basis for Petitioner's ineffective assistance of appellate counsel claim have been discussed extensively and rejected above. Because the claims are without merit, appellate counsel's performance cannot fall outside the bounds of reasonably competent professional assistance. As noted above, there is no obligation to raise meritless arguments on a client's behalf. *See Strickland*, 466 U.S. at 687-88. Moreover, there is no indication that Petitioner suffered any prejudice as a result of counsel's alleged errors. In other words, Petitioner has failed to prove that, but for appellate counsel's alleged errors, any of ineffective assistance of trial counsel or prosecutorial misconduct claims would have, in fact, been successful on appeal. Petitioner is not entitled to habeas corpus relief on his ineffective assistance of appellate counsel claim.

## C. ADMISSION OF JAIL TELEPHONE CALL RECORDINGS

Petitioner contends that his trial was rendered fundamentally unfair, in violation of his right to due process of law, when the trial court admitted recordings of telephone calls he made while in jail. According to Petitioner, statements contained in the phone calls were vulgar, offensive, and prejudicial to his right to a fair trial on the issue of whether he committed the murder of John Huston. Petitioner claims that the phone calls were irrelevant to his case and served only to inflame the jurors, causing them to improperly infer that he was a person of bad character. Petitioner's attorney objected to the admission of the recordings in his trial brief. However, the trial court determined that the recordings were admissible because there were permissible inferences that the jury could draw from them, explaining its reasoning as follows:

> Well, each of these - - each tape - - and I'm referring to the word tape loosely. I should probably say recording. That is probably more accurate, because some of these are audio tapes, and some of these have been put on a CD ROM. Each recording offered by the district attorney does contain relevant admissions of the defendant. Contained with each of these offerings are the words bitch and nigger. These words have very probable connotations alone, and out of context, they are inflammatory, and they are prejudicial. The [Court has] carefully assessed their usage and made the following

37

findings.

These words are used with different meanings, and these meanings have great relevance.  They are used as terms of endearment to effect an understanding of the great depth of friendship and the relationship between the persons.  They are used as terms of distrust to reflect the extent of the danger to the defendant's interest.  They are used as power terms, terms of intimidation, terms to invoke the position of leadership by the defendant in a position of command by the defendant.

They are used to emphasize the need of the defendant to have certain acts carried out in his behalf and to show contempt.  The probative value of these words and the context in which they are used, even though they contain these terms bitch and nigger, is highly probative and outweighs the substantial danger of undue prejudice.  There are certain portions in each of these offerings which are not relevant but which are admissible pursuant to Evidence Code 356 to add full context to the meanings and offerings.

The Court will admit these portions upon the defense request in light of the Court's ruling.

(RT at 16-17).  Following the trial court's ruling, Petitioner's attorney moved to admit the totality of the recordings, pursuant to section 356 of the California Evidence Code.[11]  The recordings of Petitioner's jail telephone calls were thus admitted in their entirety.

On direct appeal, the California Court of Appeal, Third Appellate District rejected Petitioner's claim that the trial court's admission of the recordings violated due process, explaining its reasoning as follows:

[D]efendant's sole claim on direct appeal is the trial court abused its discretion in admitting the recordings of the phone calls from jail over his Evidence Code section 352 objection.  Examining this claim in the context of the overwhelming evidence of defendant's guilt and the nature of his defense, we reject the contention.

---

[11] Section 356 of the California Evidence Code provides as follows:

Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given into evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence.

Evidence Code section 352 provides the trial court with discretion to exclude evidence if the probability that its admission will create substantial danger of undue prejudice substantially outweighs its probative value. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.) The court's discretion "will not be disturbed except on a showing the trial court acted in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

Defendant argues his statements, contained in the recordings, were unduly prejudicial. He notes he is heard frequently using a term considered to be highly derogatory to Black people. Defendant also frequently refers, in the recordings, to women by using a word commonly considered to be highly disrespectful of them. Defendant contends his improper attitude towards women is reinforced by his other highly derogatory references to women found in the recordings.

Defendant is also heard saying, "I haven't had a Christmas on the streets in six years," which he asserts is evidence of having been in jail or prison. He concludes these statements "could only have convinced the jurors that [defendant] was a person of abysmally low character[,]" an inference "so prejudicial as to violate a defendant's right to due process."

How are we to address these assertions? Relevant law is clear. "'The prejudice which [Evidence Code section 352] is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors. [Citation.]' [Citation.]" (*People v. Zapien* (1993) 4 Cal.4th 929, 958.) Defendant's statements in the recordings simply were not etymologically prejudicial.

As the trial court noted, defendant, a Black man, employs the offensive terms referring to Black people and to women for many reasons. They are often times employed as a term of affection. Sometimes "[t]hey are used as power terms, terms of intimidation, terms to invoke the position of leadership by the defendant in a position of command by the defendant." Other times, the terms "are used to emphasize the need of the defendant to have certain acts carried out on his behalf and to show contempt." Defendant's complex use of these terms diminishes their prejudice, *while giving them substantial probative value in context*. Defendant's statements establish his utter contempt for the people around him, regardless of category, and document his hair-trigger willingness to harm others and even murder them. His life, in short, takes on the aura of a bad dream to law-abiding people, but to defendant, it accurately depicts his state of mind and thus contributed to establishing motive. The trial court did not abuse its discretion in ruling the probative value of these terms outweighed any potential for prejudice.

The other profanity in the recordings, while considerable, is all too often a part of everyday life.  A "defendant's profanity-laden remarks" are not so inherently prejudicial as to require the suppression of a tape containing probative evidence.  (*People v. Hines* (1997) 15 Cal.4th 997, 1044-1045.)

Defendant's derogatory references towards women in the recordings are not unduly prejudicial when examined in the context of the entire trial.  The jury already had evidence of defendant's attitude towards women.  Randle testified she knew defendant was serious when he admitted the killing to her because he called her by her first name rather than the same derogatory term referring to women found in the tapes.  Randle also testified that defendant, in reference to Reno, said he would beat her up because she "was running her mouth."

Any potential prejudice from defendant's lament he would spend another Christmas off the streets is obviated by other evidence of his criminal past.  The trial testimony, which came in without objection, refers to defendant's drug dealing and drug use.  According to Randle's testimony, defendant committed the murder as part of a battle over his turf.  He thought people from the Bay Area, like Huston and Williams, were making more money from the territory than he does.

The prejudicial effect of prior misconduct evidence is evaluated in the context of the trial.  If the uncharged misconduct is less inflammatory than evidence describing the charged offense, then the "potential for prejudice" is diminished.  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405.)  Testimony described a premeditated killing of the victim by the defendant as part of a struggle over turf, that is a part of organized crime, however crude and amateur.  It is inconceivable the jury convicted defendant on the basis of his Christmas on the streets remark, his profanity, his attitude towards women, or his racially derisive expressions, rather than the evidence proving he murdered Huston, which he does not here challenge.

Balanced against the limited prejudicial effect of the recordings is their substantial probative value.  Defendant's statements on the recordings support the inference that Henrietta's trial testimony was a product of defendant exerting pressure on her. This in turn supports the conclusion her initial statements to the police inculpating defendant were true.  The trial court did not abuse its discretion by admitting the recordings after weighing this genuine probative value against any prejudicial effect.

(Lodged Doc. 1 at 6-10).

A state court's evidentiary ruling is not subject to federal habeas corpus review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory

40

provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  *See also Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*, 926 F.2d at 920.  Admission of evidence violates due process only if "there are no permissible inferences the jury may draw from the evidence." *Jammal*, 926 F.2d at 920.  *See also Estelle*, 502 U.S. at 68-70 (rejecting due process challenge to admission of prior bad act evidence because it "was relevant to an issue in the case").  Even then, evidence must "be of such quality as necessarily prevents a fair trial." *Id.*  (quoting *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (1986)).  Thus, in order to establish that evidence admitted by the trial court violated his due process rights, Petitioner bears the heavy burden of demonstrating that the admission of the challenged evidence "offends some principle of justice so rooted in the traditions and conscience of our people to be ranked as fundamental."  *Patterson v. New York*, 432 U.S. 197, 201 (1977) (internal citations omitted).

The inquiry on federal habeas corpus review is whether admission of the evidence was "arbitrary or so prejudicial that it rendered the trial fundamentally unfair." *Romano v. Oklahoma*, 512 U.S. 1, 12-13 (1994).  *See also Jammal*, 926 F.2d at 919 ("[T]he issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point."); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir. 1986) (habeas corpus relief unavailable unless admission of evidence was arbitrary or fundamentally unfair).  Under Ninth Circuit law, the question is "whether inferences relevant to a fact of consequence may be drawn from each piece of evidence, or whether they lead only to impermissible inferences about the defendant's character." *McKinney v. Rees*, 993 F.2d 1378, 1381 (9th Cir. 1993).  *See also Jamal*, 926 F.2d at 920 ("Evidence introduced b the prosecution will often raise more than one inference, some permissible, some not; we must rely on the jury to sort them out in light of the court's instructions.").

The state courts' determination of Petitioner's claim was not contrary to or an unreasonable application of clearly established federal law.  The state court's factual findings are

presumed correct and Petitioner has not presented any clear and convincing evidence to overcome the presumption.  28 U.S.C. § 2254(e)(1).  Here, both the state trial and appellate courts determined that portions of the recordings of Petitioner's jail telephone calls were highly relevant because they contained statements indicative of his guilt.  For instance, statements in the recordings support the permissible inference that witness Henrietta Reno changed her statement to police and her trial testimony regarding the night of the murder due to Petitioner's exertion of pressure on her.  The presence of vulgar and obscene language by Petitioner was not so prejudicial as to outweigh the probative value of the relevant portions of the tape recordings and, as explained by the state courts, the use of such language by Petitioner provided probative value with regard to Petitioner's attitude toward the people in his life, his need to have certain acts carried out on his behalf, and his state of mind.  Moreover, it is important to note that the trial court determined that only relevant portions of the recordings should be admitted into evidence.  It was upon motion by Petitioner's trial counsel that the recordings were admitted in their entirety, pursuant to section 356 of the California Evidence Code in order to provide the jury with the greater context in which the relevant statements were made.

Petitioner's trial was not rendered fundamentally unfair by the admission at trial of the recordings of his jail phone calls.  He is thus not entitled to habeas corpus relief on this claim.

## VI.  CONCLUSION

IT IS RECOMMENDED that Petitioner's petition for writ of habeas corpus be denied.  These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Turner v. Duncan*, 158 F.3d

449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In any objections he elects to file petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case.  *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: May 13, 2011

Charlene H. Sorrentino

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE